# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
November 2, 2016 Session

## GALA JOHNSON-MURRAY ET AL. V. RODNEY BURNS ET AL.

**Appeal from the Chancery Court for Williamson County**
No. P-6421        Joseph A. Woodruff, Judge

_____

### No. M2016-00431-COA-R3-CV - Filed March 14, 2017

_____

Nieces of the decedent contest the validity of a quitclaim deed and the decedent's will on the ground they were the result of undue influence exerted upon the decedent by her stepson and his wife. The quitclaim deed conveyed the decedent's real property to herself, her stepson, and his wife as joint tenants with right of survivorship. The will bequeathed the decedent's entire estate to her stepson. Following a jury trial, the jury found that the deed and will were both valid. The nieces appeal, contending there is no material evidence to support the jury's verdict. They also contend the trial court erred by instructing the jury that the stepson, who was the decedent's attorney-in-fact, had the authority to sign the will and deed on behalf of the decedent. We have determined that the record contains material evidence to support the jury's verdict. As for the jury instructions, the trial court erred by instructing the jury that the stepson had the authority to sign the will on behalf of the decedent as her attorney-in-fact because it would not comply with mandatory requirements of the Tennessee Execution of Wills Act. With regard to whether the stepson could sign the deed on behalf of the decedent, the answer and jury instruction were incomplete to such an extent as to constitute an erroneous instruction. Nevertheless, having considered the jury instruction in its entirety, we are unable to conclude that these errors more probably than not affected the outcome of the verdict. Therefore, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Jonathan L. Miley, Nashville, Tennessee, for the appellants, Gala Johnson-Murray and Bertha Mary Murray.

J. Timothy Street, Franklin, Tennessee, for the appellees, Rodney Burns and Aretha Kaye Burns.

**OPINION**

Elizabeth Jones Patton ("the decedent") died on January 17, 2012, at the age of 95. She was survived by two nieces, Bertha Murray and Gala Johnson-Murray ("Plaintiffs"), and her stepson and his wife, Rodney Burns and Aretha Burns, respectively ("Defendants").[1]

One month after the decedent's death, Rodney Burns filed a Small Estate Affidavit with the Chancery (Probate) Court of Williamson County, stating the estate had assets of less than $25,000. On February 21, 2012, Gala Johnson-Murray filed a petition to admit to probate a document dated December 10, 1985, purporting to be the last will and testament of the decedent ("the 1985 will"). In the 1985 will, the decedent bequeathed and devised the entirety of her estate to Plaintiffs[2] with the exception of property at 8237 Horton Highway, College Grove, Tennessee ("the Horton Property"), which was devised to Rodney Burns.

Rodney Burns filed a response to the petition claiming that he was in possession of the decedent's more recent will and submitted for probate a document dated November 9, 2010, likewise purporting to be the decedent's last will and testament ("the 2010 will"). In the 2010 will, the decedent revoked all prior wills, disinherited Plaintiffs, and named Rodney Burns as the sole beneficiary. Mr. Burns also submitted a quitclaim deed dated November 9, 2010 ("the 2010 deed"), conveying the Horton Property from the decedent to herself and Defendants as joint tenants with right of survivorship, as well as a document dated November 29, 2011, purporting to be the first codicil to the 2010 will ("the 2011 codicil"). The 2011 codicil designated Aretha Burns as the sole beneficiary in the event her husband predeceased the decedent.

On September 25, 2012, Plaintiffs filed a petition to contest the validity of the 2010 will and the 2011 codicil. Plaintiffs subsequently filed an amended complaint to declare the 2010 deed null and void and to quiet title to the real property in the estate. Plaintiffs alleged that the decedent was not of sound mind and body when the deed, will, and codicil were executed and that all three instruments were the result of Defendants' undue influence.

By order entered on November 13, 2012, the trial court identified the issues to be determined. The issues relevant to this appeal are: (1) the competency of the decedent in executing the 2010 deed, the 2010 will, and the 2011 codicil; (2) whether the deed, will,

---

[1]The decedent had no children. Rodney Burns is the son of the decedent's husband, who predeceased her by many years. Mr. Burns came to live with decedent when he was five-years old.

[2] Bertha Murray and Eula Lee Johnson were beneficiaries under the 1985 will. Eula Lee Johnson is deceased, and she is survived by her only child, Gala Johnson-Murray.

or codicil were procured by Defendants exerting undue influence on the decedent; and (3) if the 2010 will is not valid, whether the 1985 will is valid.

The case was tried before a jury, and the testimony revealed the following: Rodney Burns lived with the decedent at the Horton Property from the time he was five-years old until he married Aretha Burns in 1985, at which time he and his wife moved into the home next door to the decedent, where they remain. The decedent suffered a stroke in 2005, at which time Defendants began assisting the decedent by, *inter alia*, cleaning the house and taking her to doctor's appointments. Mr. Burns also explained that he worked during the day and that he installed a gate at the decedent's home to keep strangers from coming upon the decedent's property while she was at home alone.

Several of the decedent's family members and friends testified that the decedent was very close with her extended family. Howard Rucker, a pastor and distant cousin of the decedent, testified that he had a good relationship with the decedent. Mr. Rucker stated that he frequently visited the decedent in her home, from 2010 up until her death. He also stated that he visited the decedent after the gate was installed and that he never saw the gate chained and locked. He further testified that once the gate was installed, he could go around the side of the gate. Mr. Rucker testified that the decedent always recognized him when he visited. He described the decedent as a highly respected lady and that you could not talk her into something she didn't want to do. When asked if the decedent had lost her mental abilities, Mr. Rucker responded that the decedent was "always sharp-minded."

Hattie May Smith, who is Mr. Rucker's sister, testified that she was good friends with the decedent and would often visit the decedent's home. She testified that on one occasion when she visited the decedent in September of 2010, she was unable to enter the house through the front door because linoleum or carpet had detached from the floor, which prevented it from opening. Ms. Smith also stated that she noticed a smell of urine coming from the house. Subsequently, Ms. Smith made a referral to the Adult Protective Services division of the Tennessee Department of Human Services ("the Department"). Ms. Smith testified that, approximately one month later, she contacted the Department a second time because she observed cars blocking the decedent's driveway.

Lori Bartlett, who is employed by the Department, investigated the referrals of self-neglect in reference to the decedent. Ms. Bartlett stated that the decedent would spend some nights at her residence and some nights at Defendants' residence next door. She testified that the decedent needed some assistance in the home, e.g., help with meals because she had difficulty seeing and assistance with medications and other activities such as getting bath water ready. Regarding the first referral, Ms. Bartlett confirmed that it was difficult to get into the house through the front door and that there was an odor of urine in the house. She addressed those issues with Defendants, and the case was subsequently closed as invalid because Ms. Bartlett determined that Defendants were

assisting the decedent adequately. As to the second referral, Ms. Bartlett determined it to be invalid because the decedent was receiving the help that she needed. Specifically, Ms. Bartlett testified that there were no concerns that the decedent was being neglected. Ms. Bartlett testified that following her investigations into the two referrals of self-neglect, she was satisfied that the decedent was capable of taking care of herself with some assistance. She further testified that the decedent indicated that she did not want to be bothered by Hattie May Smith anymore and that Defendants contacted the Williamson County Sheriff's Department. Ms. Bartlett testified that she spoke to the officer and confirmed that the decedent did not want Ms. Smith in her home.

Aretha Burns testified that, following Ms. Bartlett's first visit, the decedent executed three powers of attorney to Rodney Burns, with Aretha Burns to be the successor power of attorney.[3] Ms. Burns testified that the powers of attorney were a product of the suggestion of Ms. Bartlett. The powers of attorney were executed on September 20, 2010. Upon execution, Ms. Burns transmitted the documents to the Department via facsimile. However, both Aretha and Rodney Burns testified that the powers of attorney were never exercised.

Rodney Burns testified that he never attempted to restrict family members or friends from seeing the decedent, other than Hattie May Smith. Regarding the decedent's finances, Mr. Burns testified that the decedent would endorse her social security checks, and then he would cash them and give the money directly to her. Mr. Burns explained that the decedent would then give him the money to pay her bills and that there was little, if any, money left over after her bills were paid. He stated that they followed this protocol for over twenty-two years and it was not changed after obtaining the powers of attorney.

The jury also heard deposition testimony from the decedent's doctor, Gwendolyn Howard, M.D, which revealed the following: Dr. Howard began treating the decedent following the decedent's May 2005 stroke. Dr. Howard noted that the decedent did not have any deficits subsequent to the stroke and was not suffering from any residual effects of the stroke. Dr. Howard testified that Rodney Burns brought the decedent to all of her appointments and that the decedent "seemed like she was extremely well cared for." As to the decedent's mental capacity, Dr. Howard testified that, up until shortly before her death, the decedent was "aware of her surroundings and what was going." Dr. Howard saw the decedent in October and November of 2010 at which times her cognition and understanding were "very good given her age."

---

[3] The three documents are titled: Durable Unlimited Power of Attorney, Effective Only Upon Disability; Durable Unlimited Power of Attorney, Effective Immediately; and Unlimited Power of Attorney.

As to the procurement of the 2010 deed, Rodney Burns testified that the decedent told him that she "had gotten to the age where she [couldn't] take care of the property like she used to, and she wanted [him] to have [the Horton Property] so [he] could continue taking care of it." Mr. Burns testified that the decedent chose attorney Fred Dance to draft the deed because Mr. Dances' father had rendered legal services to the decedent and her late husband in the past. The 2010 deed was prepared by Mr. Dance a week or two before the execution date of the 2010 will. The deed conveyed the Horton Property from the decedent, who was the sole owner of the property, to herself and Defendants as joint tenants with right of survivorship.

As for the 2010 will, Jesse Eugene Bennett, a friend and former employer of the decedent, testified that the decedent expressed to him that she wanted to make a will.[4] Mr. Bennett agreed to assist the decedent and told her that she would need to put her wishes in writing. Following her conversation with Mr. Bennett, the decedent sent a written note to Mr. Bennett that set forth her wishes. Mr. Bennett then engaged LegalZoom to draft a will consistent with the decedent's instructions. Mr. Bennett also testified that he paid for the will to be prepared by LegalZoom but that he did not write the will; he merely forwarded the decedent's written instructions. When Mr. Bennett received a package from LegalZoom, he opened it to make sure it was the decedent's will, determined it was, and sent the draft will to the decedent. According to Mr. Bennett, the decedent, although "frail," was still "sharp" and "had all of her facilities [sic]" at that time.

Rodney Burns took the decedent to the bank on November 9, 2010, where the decedent executed both the 2010 deed and the 2010 will in the presence of two witnesses and a notary.[5] Nathaniel Burgess, the manager of the bank, notarized the signatures to both documents. Mr. Burgess testified that he was satisfied the decedent was of sound mind and not under any undue influence. When questioned whether he could recall if the decedent was blind or had bad vision, Mr. Burgess responded that "she seemed perfectly capable." He further testified that the decedent looked at the document and was able to sign her name without any guidance or assistance. Mr. Burgess's testimony was corroborated by Walter Mack Turner, a witness to the 2010 will, who testified that the decedent didn't appear to have any disabilities and that she used her own hand to sign the 2010 will.

---

[4] Mr. Bennett testified that he had known the decedent for over forty years and that he considered her a highly trusted confidant. He further testified that the decedent would come to him for advice and that he felt like "she put a lot of confidence in [him]."

[5] When questioned as to why the deed was not executed at the time it was picked up at Mr. Dance's office, Mr. Burns explained that "[he] wanted to read it back to [the decedent] to make sure that's what she wanted."

Elizabeth Russell testified that she was a witness to the 2011 codicil, which the decedent executed on November 29, 2011, in the law offices of Timothy Street. Ms. Russell, an attorney, testified that the decedent was advanced in age and in a wheelchair but that she did not know if the decedent was blind. Ms. Russell also stated that the codicil was read aloud to the decedent, slowly and audibly, by an employee at the law office. She said the decedent was aware of what was going on and expressed that the codicil embodied her intent. Ms. Russell stated that a legal-sized clipboard was given to the decedent so that she could hold the codicil in her lap and stay in the wheelchair while she signed it. Ms. Russell explained that there was no armrest on the wheelchair, so Rodney Burns helped steady the decedent's arm. Ms. Russell explained that the decedent held the pen as she executed the document and that Rodney Burns was simply providing support for her arm.

At the conclusion of the trial, the jury entered into deliberations. While in deliberations, the jury submitted the following question: "If [Rodney Burns] had power of attorney, could he sign Will and Deed for [the decedent]?" The trial judge responded "Yes" and provided the jury with a citation of Tenn. Code Ann. § 66-5-104, the general statutory duty of an attorney-in fact, which reads:

> Instruments in relation to real or personal property, executed by an agent or attorney, may be signed by such agent or attorney for the principal, or by writing the name of the principal by that person as agent or attorney; or by simply writing the agent's or attorney's own name or the principal's name, if the instrument on its face shows the character in which it is intended to be executed.

Tenn. Code Ann. § 66-5-104.

Following deliberations, the jury returned a verdict in favor of Defendants. On the jury verdict form, the jury was asked to answer two questions; the questions and the jury's answers are as follows:

> 1) Is the document dated November 9, 2010 entitled "Last Will and Testament" the valid Last Will and Testament of the decedent, Elizabeth Jones Patton? ANSWER: Yes.
>
> 2) Is the Deed dated November 9, 2010 conveying property as 8235 Horton Highway, College Grove, TN 37046 from Elizabeth Jones Patton, Rodney Burns and Aretha Burns a valid Deed? ANSWER: Yes.

After the trial court entered the judgment, Plaintiffs filed a timely motion for a directed verdict or in the alternative a new trial, which was denied. This appeal followed.

ANALYSIS

Plaintiffs contend we must set aside the jury's verdict because it is "wholly unsupported by the evidence." They contend the evidence proved the existence of a confidential relationship, that Defendants exercised undue influence over the decedent to obtain the 2010 will and 2010 deed, which benefited Defendants, and that Defendants failed to prove by clear and convincing evidence that the 2010 will and deed were fair to the decedent. Plaintiffs also contend that the trial court committed reversible error in answering the jury's question "yes" and by supplementing the instructions with Tenn. Code Ann. § 66-5-104. We will address each issue in turn.

## I. SETTING ASIDE THE JURY'S VERDICT

"Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Tenn. R. App. P. 13(d). "Material evidence is evidence material to the question in controversy, which must necessarily enter into the consideration of the controversy and by itself, or in connection with the other evidence, be determinative of the case." *Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 422 (Tenn. 2013). When determining whether there is material evidence to support a jury verdict, we must "take the strongest legitimate view of all the evidence in favor of the verdict, assume the truth of all evidence that supports the verdict, allow all reasonable inferences to sustain the verdict, and discard all countervailing evidence." *Akers v. Prime Succession of Tenn., Inc.*, 387 S.W.3d 495, 501-02 (Tenn. 2012) (quoting *Barkes v. River Park Hosp., Inc.*, 328 S.W.3d 829, 833 (Tenn. 2010)). Moreover, we are not permitted to reweigh the evidence or decide where the preponderance of the evidence lies. *Meals*, 417 S.W.3d at 423. If there is any material evidence to support the verdict, we must affirm it; otherwise, the parties would be deprived of their constitutional right to trial by jury. *Id.* As our Supreme Court has explained:

> The material evidence analysis is very deferential to the award by the jury and the judgment of the trial court when it affirms the verdict as the thirteenth juror. It matters not a whit where the weight or preponderance of the evidence lies under a material evidence review. It is simply a search of the record to ascertain if material evidence is present to support the verdict. Because the material evidence standard lies at the foundation of the right to trial by jury, if there is material evidence to support a jury verdict, the appellate courts must affirm it.

*Meals*, 417 S.W.3d at 422-23 (quotations and citations omitted).

In this case, the jury returned a verdict finding both the 2010 will and the 2010 deed to be valid. Plaintiffs contend the jury's verdict must be overturned because they proved the existence of a confidential relationship, that Defendants exercised undue

influence over the decedent to obtain the will and deed, which benefited Defendants, and that Defendants failed to prove by clear and convincing evidence that the 2010 will and deed were fair to the decedent. We begin our assessment with the subject of undue influence and confidential relationships.

As a general rule, it is presumed that undue influence does not enter into the making of a will and the burden of proving undue influence falls upon the person contesting the will. *Kelley v. Johns*, 96 S.W.3d 189, 196 (Tenn. Ct. App. 2002); *In re Estate of Maddox*, 60 S.W.3d 84, 88-89 (Tenn. Ct. App. 2001). Undue influence "upon a testator consists of substituting the will of the person exercising it for that of the testator." Jack W. Robinson, Sr., & Jeff Mobley, *Pritchard on the Law of Wills and the Administration of Estates* § 124, at 203 (5th ed. 1994). Influence upon a capable mind is not prohibited; it is the undue influence thereof which is prohibited. *Parham v. Walker*, 568 S.W.2d 622, 624 (Tenn. App. 1978).

For the doctrine of undue influence to be applicable, there must be in existence a confidential relationship where one party, the beneficiary, is in a position, because of the confidential relationship, to exercise undue influence over the mind and will of the testator. *Parham v. Walker*, 568 S.W.2d at 624 (citing *Turner v. Leathers*, 232 S.W.2d 269, 271 (Tenn. 1950)). "A confidential relationship is any relationship which gives one person dominion and control over another." *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002). Thus, "the doctrine of undue influence is applicable only where there is a confidential relationship with the testator whereby one party is able to dominate and exercise undue influence over the testator. . . ." *In re Estate of Brevard*, 213 S.W.3d 293, 302 (Tenn. Ct. App. 2006), *perm app. denied* (Tenn. 2007).

A presumption of undue influence arises when there is a confidential relationship followed by a transaction in which the dominant party receives a benefit from the other party. *Childress*, 74 S.W.3d at 328. "The burden of proof regarding a confidential relationship rests upon the party claiming the existence of such a relationship." *Id.* If a confidential relationship is established, a presumption of undue influence arises and the burden of proof "shifts to the dominant party to rebut the presumption by proving the fairness of the transaction by clear and convincing evidence." *Id.*

Generally, confidential relationships originate from "legal relationships" and "family and other relationships." *In re Estate of Brevard*, 213 S.W.3d at 303 (citing *Matlock v. Simpson*, 902 S.W.2d 384, 385-86 (Tenn. 1995)). A "legal confidential relationship" arises when there is some legal connection between the dominant party and the weaker party, such as when a dominant party is granted a power of attorney. *See id.* However, "an *unexercised power of attorney* does not in and of itself create a confidential relationship. . . ." *Childress*, 74 S.W.3d at 329. Moreover, proof of "family and other relationships" alone does not establish a confidential relationship. *Matlock*, 902 S.W.2d 385-86. However, "proof of such relationships coupled with proof of dominion and

control, does establish the existence of a confidential relationship, but does not make out a prima facie claim of undue influence unless an additional suspicious circumstance exists." *In re Estate of Brevard*, 213 S.W.3d at 303 (citing *Kelly*, 96 S.W.3d 189).

Plaintiffs contend they were entitled to a presumption of undue influence because they proved there was a confidential relationship and Defendants benefitted from the 2010 will and deed. As a consequence, the burden shifted to Defendants to prove by clear and convincing evidence that the will and deed were fair to the decedent. Furthermore, Plaintiffs contend the verdict must be set aside because Defendants failed to carry their burden of proof.

For their part, Defendants insist Plaintiffs failed to prove a confidential relationship existed as a matter of law; therefore, Defendants did not have the burden to prove the fairness of the transactions.

## A. LEGAL CONFIDENTIAL RELATIONSHIP BASED ON POWER OF ATTORNEY

Plaintiffs contend the decedent's execution and delivery of powers of attorney to Defendants created an "undeniable *per se*" confidential relationship. Defendants counter this argument by insisting they never exercised the power of attorney and an *unexercised* power of attorney does not in and of itself create a confidential relationship.

As Defendants correctly assert, "an unexercised power of attorney does not in and of itself create a confidential relationship." *Childress*, 74 S.W.3d at 329. The *Childress* court explained that the "core definition of a confidential relationship requires proof of dominion and control." *Id.* (citing *Matlock*, 902 S.W.2d at 385-86; *Mitchell v. Smith*, 779 S.W.2d 384, 389 (Tenn. Ct. App. 1989)). The court went on to explain, "When an unrestricted power of attorney is executed but has not yet been exercised, good sense dictates that there exists no dominion and control and therefore no confidential relationship based solely on the existence of the power of attorney." *Id.*

Therefore, whether Defendants had a legal confidential relationship with the decedent based on the powers of attorney hinges on whether Defendants exercised their powers of attorney. Plaintiffs note that Rodney Burns cashed the decedent's social security checks and paid her bills after he received the powers of attorney. Although Mr. Burns was tasked with the responsibility to "cash" the checks for the decedent, he did not use—or need to use—his power of attorney because all of the checks were endorsed by the decedent. Therefore, Rodney Burns did not exercise his power of attorney to cash the previously endorsed checks.

The only proof that Rodney Burns did anything with the powers of attorney is that his wife faxed copies of the powers of attorney to Dr. Howard's medical offices and to the Department so they would be on file in case Defendants needed to exercise the

powers in the future. The record established that the doctor's office received and maintained them in their records; however, there is no proof that Defendants ever exercised these powers.

Based on facts identified above, there was material evidence for the jury to find that Plaintiffs failed to prove the existence of a legal confidential relationship because Defendants never exercised the powers of attorney.

## B. FAMILIAL CONFIDENTIAL RELATIONSHIP

The record clearly establishes a close familial relationship existed between Defendants and the decedent; however, as Defendants note, "the normal relationship of parent and child [is] not, *per se*, a confidential relationship." *Matlock*, 902 S.W.2d at 385 (citing *Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977)). The *Matlock* court explained that the distinction between "legal confidential relationships" and the confidentiality inherent in "family and other relationships" hinges on proof of "dominion and control." *Id*. at 385-86 (citing *Kelly*, 558 S.W.2d at 848).

Plaintiffs contend Defendants' dominion and control over the decedent was proven based on the fact she was extremely frail, could not walk on her own, and relied on Defendants to bring her food, to clean her home, to bathe her, to dress her, to take her to doctor's appointments, to give her the medications she required, to pay her bills, to keep her yard orderly, and to make repairs on the home. Plaintiffs also contend Defendants exerted dominion and control over the decedent by installing a gate at the entrance of her driveway and requiring visitors to obtain Defendants' permission to visit her.

As noted earlier, we must take the strongest legitimate view of the evidence that favors the verdict, assume the truth of all the evidence that supports the verdict, and allow all reasonable inferences to sustain the verdict. *See* Tenn. R. App. P. 13d; *see also Kelly v. Johns*, 96 S.W.3d 189, 194 (Tenn. Ct. App. 2002). In this case, while there is evidence to support a finding that Defendants exercised dominion and control over the decedent, there is evidence to support the finding that Defendants did not exercise dominion and control over her.

Howard Rucker testified that he frequently visited the decedent in her home until shortly before her death. He testified that he had no problem visiting her after the gate was installed. Mr. Rucker testified that when he visited Ms. Patton, she always recognized him. He described her as a highly respected lady with a lot of dignity, and he could not talk her into something she did not want to do. Likewise, Mr. Bennett, the decedent's former employer and a confidant of 40 years, testified that, "You couldn't make [the decedent] do anything she didn't want to do." Mr. Bennett also testified that he questioned the decedent about her stated desire to leave her entire estate to Rodney Burns, to which she responded by stating that she knew what she was doing. Further, he

testified that the decedent was cognizant of what was going on and still "sharp" when she made that decision. Elizabeth Russell, an attorney, who witnessed the decedent executing her codicil at Ms. Russell's law office, testified that the decedent was aware of what was going on and the decedent stated that the codicil embodied her intent.[6]

Lori Bartlett, a case worker with the Department, testified that she went to the decedent's home with her supervisor to assess her living conditions and they had no concerns. Dr. Howard, the decedent's primary care physician, testified the decedent was not suffering from dementia in November 2010 and she was able to answer all questions. Dr. Howard also stated that the decedent was able to recall events sufficient to give Dr. Howard a medical history, including recent events. Dr. Howard testified that the decedent was of sound mind and sufficient memory to know and understand the activities she engaged in. Dr. Howard testified that the decedent's cognition and understanding were very good.

Based on the foregoing and other facts in the record, we conclude there was material evidence for the jury to find that the decedent did not have a confidential relationship with Defendants. We further conclude that there was material evidence for the jury to find the 2010 will and 2010 deed were not the products of undue influence but, instead, were the products of the free exercise of independent judgment by the decedent.

## II. JURY INSTRUCTIONS

Plaintiffs contend the trial court committed reversible error with its answer to the jury's question and by supplementing the instructions with Tenn. Code Ann. § 66-5-104.

### A. THE COURT'S DUTY TO INSTRUCT A JURY ON THE FACTUAL ISSUES AND THEORIES

The trial court has a duty to instruct the jury on every factual issue and theory of the case. *Cole v. Woods*, 548 S.W.2d 640, 642 (Tenn. 1977). "Whether a jury instruction is proper is a mixed question of law and fact, 'determined from the theories of the parties, the evidence in the record and the law applicable thereto.'" *Ricketts v. Robinson*, 169 S.W.3d 642, 646 (Tenn. Ct. App. 2004) (quoting *Solomon v. First Am. Nat'l Bank of Nashville*, 774 S.W.2d 935, 940 (Tenn. Ct. App. 1989)). The standard by which we examine a trial court's jury charge is as follows:

---

[6] "The mental condition of the testator at the time of executing the will is the only point of inquiry; but evidence of mental condition before and after making the will, if not too remote in point of time, may be received as bearing upon that issue." *In re Estate of Thornton*, No. M2011-01287-COA-R3CV, 2012 WL 112598, at \*7, n.1 (Tenn. Ct. App. Jan. 12, 2012) (citing *In re Estate of Elam*, 738 S.W.2d 169, 171-72 (Tenn. 1987)).

We review the jury charge in its entirety to determine whether the trial judge committed reversible error. Jury instructions are not measured against the standard of perfection. The charge will not be invalidated if it "fairly defines the legal issues involved in the case and does not mislead the jury." Furthermore, a particular instruction must be considered in the context of the entire charge.

*Id*. (quoting *City of Johnson City v. Outdoor West, Inc*., 947 S.W.2d 855, 858 (Tenn. Ct. App. 1996)).

Furthermore, Tennessee Rule of Appellate Procedure 36(b) instructs:

A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process. When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.

During their deliberations the jury asked: "If Appellee Rodney Burns had power of attorney, could he sign Will and Deed for Mrs. Patton?" The trial court answered by stating "Yes" and supplementing the jury instruction with Tenn. Code Ann. § 66-5-104, which states:

Instruments in relation to real or personal property, executed by an agent or attorney, may be signed by such agent or attorney for the principal, or by writing the name of the principal by that person as agent or attorney; or by simply writing the agent's or attorney's own name or the principal's name, if the instrument on its face shows the character in which it is intended to be executed.

As previously noted, by order entered on November 7, 2012, the trial court identified the issues to be determined.[7] Whether Rodney Burns could sign the 2010 will or the 2010 deed on behalf of the decedent was not identified as an issue. Moreover, Rodney Burns did not sign the 2010 will or the 2010 deed. Therefore, whether Mr. Burns could have signed the will or the deed on behalf of the decedent was not an issue to be

---

[7] The issues identified by the trial court that are relevant to this appeal are: (1) the competency of the decedent in executing the quitclaim deed dated November 9, 2010, the will dated November 9, 2010, and the codicil dated November 29, 2011; (2) whether the wills or the deed were procured by Defendants exerting undue influence on the decedent; and (3) if the 2010 will is not valid, whether the 1985 will is valid.

considered by the jury. Jury instructions must only "reflect the theories that are supported by the parties' pleadings and proof, as well as the parties' claims and defenses." *Goodale v. Langenberg*, 243 S.W.3d 575, 584 (Tenn. Ct. App. 2007) (citing *Cole*, 548 S.W.2d at 642). Therefore, the trial court should not have answered the question in the affirmative or negative, and it should not have given the supplemental instruction concerning Tenn. Code Ann. § 66-5-104. Instead, the trial court should have merely instructed the jury to render a verdict based on the jury instructions previously given.

## B. THE TRIAL COURT'S ANSWER AND SUPPLEMENTAL INSTRUCTION

For the following reasons, we have determined that the trial court's answer and the supplemental instruction were erroneous.

### *i. The Will*

The execution of attested wills in Tennessee is governed by the Tennessee Execution of Wills Act codified in Tenn. Code Ann. § 32-1-104. *In re Estate of Chastain*, 401 S.W.3d 612, 618-19 (Tenn. 2012).[8] The indispensable requirements mandated by the Execution of Wills Act requires the testator to either sign the will in the presence of the attesting witnesses, or acknowledge a signature already made in the presence of attesting witnesses, or direct someone else to sign the will in the presence of the testator and of the attesting witnesses. *Id.* (citing Tenn. Code Ann. § 32-1-104(a)(1)(A)-(D)). As our Supreme Court explained in *In re Estate of Chastain*:

> This statute gives a testator some latitude in the manner of signing an attested will. . . . But the statute demands that the testator's signature be

---

[8] At all times material to this appeal, Tenn. Code Ann. § 32-1-104(a) stated that the execution of a will, other than a holographic or noncupative will, must be by the signature of the testator and of at least two witnesses as follows:

(1) The testator shall signify to the attesting witnesses that the instrument is the testator's will and either:

    (A) The testator sign;
    (B) Acknowledge the testator's signature already made; or
    (C) At the testator's direction and in the testator's presence have someone else sign the testator's name; and
    (D) In any of the above cases the act must be done in the presence of two (2) or more attesting witnesses.

(2) The attesting witnesses must sign:

    (A) In the presence of the testator; and
    (B) In the presence of each other.

placed on the will by one of these means. *Id.* The testator's signature is essential to the creation of a will. *See Simmons v. Leonard*, 91 Tenn. 183, 18 S.W. 280, 282 (1892) ("**[T]here can be no valid attestation or subscription unless it be a fact that the testator has actually signed his name, or caused it to be signed, before [the witnesses] subscribed their names. There is no will to witness until it has been signed by the testator**.").

*Id.* at 619 (emphasis added).

Not only must the testator personally sign the will, the Wills Act also requires that "[t]he testator shall signify to the attesting witnesses that the instrument is the testator's will." Tenn. Code Ann. § 32-1-104(a)(1). Significantly, there is no statutory provision in the Wills Act authorizing an attorney-in-fact to "signify" on the testator's behalf in this regard. *See id.* Moreover, the Wills Act expressly requires that the attesting witnesses sign *in the presence of the testator* and of each other. Tenn. Code Ann. § 32-1-104(a)(2)(A)-(B).

Our Supreme Court made it clear in *Chastain* that "it is indispensable that every requirement of the Tennessee Execution of Wills Act be complied with in the execution of a will." *In re Estate of Chastain*, 401 S.W.3d at 620 (quoting *Pritchard* § 4, at 10). One of the statutory requirements is that the testator sign the will. *See* Tenn. Code Ann. § 32-1-104. Had Mr. Burns signed the 2010 will on behalf of the decedent, his act would not have complied with the Wills Act. Therefore, it would not have been a valid will. *See id.*

Because Mr. Burns did not have the authority to sign the 2010 will, or any will, on behalf of the decedent, instructing the jury that he could sign the will on behalf of the decedent was error.

### ii. The Deed

We agree that Mr. Burns had the "authority" to sign "[i]nstruments in relation to real or personal property" for the decedent and thus could have signed the 2010 deed on behalf of the decedent. Significantly, however, his authority to sign a deed that conveyed a benefit to himself and his wife was limited and subject to evidentiary presumptions that were not conveyed to the jury in the court's response to the question.[9]

---

[9] The trial court supplemented its answer to the jury's question by adding Tenn. Code Ann. § 66-5-104 to its jury instructions. This statute does not give an attorney-in-fact any authority to execute legal instruments; it merely identifies the alternative forms by which an agent or attorney may execute an instrument in relation to real or personal property "for the principal." *Id.* Therefore, the statute should not have been included in the jury instruction.

As mandated by all three powers of attorney, Mr. Burns' authority was limited to acts that were "in the decedent's best interest." In this case, had Mr. Burns exercised his power of attorney by signing the 2010 deed on behalf of the decedent, a deed that benefitted Mr. Burns and his wife because it conveyed property to Defendants as joint tenants with the right of survivorship with the decedent, there would be a presumption that some improper advantage was taken which could render the deed invalid. *See In re Estate of Elam*, 738 S.W.2d 169, 173 (Tenn. 1987); *see also Richmond v. Christian*, 555 S.W.2d 105, 107 (Tenn. 1977)). Furthermore, Mr. Burns would have had the burden to prove by clear and convincing evidence that the deed was fair to the decedent. *See Ralston v. Hobbs*, 306 S.W.3d 213, 227-28 (Tenn. Ct. App. 2009). Significantly, however, the jury was not informed of the presumption that some improper advantage was taken of the decedent or that Mr. Burns' burden to prove by clear and convincing evidence that the conveyance of the property was fair to the decedent.

For these reasons, the trial court's answer and the supplemental jury instruction failed to constitute a complete and correct charge of the law. *See State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011) (holding that the constitutional guarantee of a right to trial by jury includes the "right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions"). Therefore, the answer and supplemental instruction were erroneous.

Having determined that the answer and supplemental jury instruction constitute error, we must now consider whether this error constitutes reversible error.

## C. HARMLESS ERROR

The constitutional guarantee of a right to trial by jury includes the "right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011)); *see* U.S. Const. amend. VI; Tenn. Const. art. I, 6.

> The trial court's instructions guide the jury in its deliberations. The instructions must be plain and understandable, and must inform the jury of each applicable legal principle. *Wielgus v. Dover Indus.*, 39 S.W.3d 124, 131 (Tenn. Ct. App. 2001). They must also reflect the theories that are supported by the parties' pleadings and proof, as well as the parties' claims and defenses. *Cole v. Woods*, 548 S.W.2d 640, 642 (Tenn. 1977). Jury instructions must be correct and fair as a whole, although they do not have to be perfect in every detail. *Wielgus*, 39 S.W.3d at 131. Upon review, we

read a trial court's instructions to the jury in their entirety and in context of the entire charge. *See id*.

*Goodale*, 243 S.W.3d at 584-85.

We have determined that the instructions given to the jury immediately following closing arguments were plain and understandable, and they were sufficient to inform the jury of each applicable legal principle applicable to the issues raised by the parties in this case. *See Goodale*, 243 S.W.3d at 585. These instructions also addressed the theories raised by the pleadings, the claims and defenses asserted, and the evidence in the record. *See id*. Furthermore, they were correct and fair as a whole. *See id.* Although the trial court's answer to the jury's question and the supplemental jury instruction did not pertain to any issue, claim, or defense raised at trial and were erroneous, jury instructions do not have to be perfect in every detail. *See id*.

When considered in the context of the entire charge, we are unable to conclude that the error more probably than not affected the outcome of the verdict. "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). Therefore, we conclude that the error was harmless.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Plaintiffs.

_____
FRANK G. CLEMENT, JR., P.J., M.S.