IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 13, 2017 Session

## BARBARA JARNIGAN ET AL. V. CLAUDE MOYERS

Appeal from the Chancery Court for Hamblen County
No. 2016-CV-143    Douglas T. Jenkins, Chancellor

———————————————————

No. E2016-02398-COA-R3-CV

———————————————————

This case involves allegations of fraud and undue influence with respect to the estate of Brenda Vargo (the deceased). Following the deceased's death, four surviving family members discovered that they were no longer designated as "payable-on-death" beneficiaries on several of the deceased's bank accounts. These family members filed suit against Claude Moyers (Mr. Moyers), alleging that Mr. Moyers's wife, Wanda Moyers (Mrs. Moyers), persuaded the deceased, "through fraud or undue influence," to close some of her bank accounts and to name Mr. Moyers as the sole payable-on-death beneficiary on the remaining accounts. Following a bench trial, the court determined that Mrs. Moyers had a confidential relationship with the deceased; hence, creating a rebuttable presumption of undue influence. The trial court imputed the undue influence of Mrs. Moyers to Mr. Moyers. Ultimately, the trial court determined that Mr. Moyers failed to rebut the presumption of undue influence by clear and convincing evidence. Consequently, the court divested Mr. Moyers of his interest in the disputed funds. Mr. Moyers appeals. We reverse and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Reversed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

Link A. Gibbons, Morristown, Tennessee, and Katherine A. Young, Knoxville, Tennessee, for the appellant, Claude Moyers.

Mark A. Cowan, Morristown, Tennessee, for the appellees, Barbara Jarnigan, Wanda Lovin, Mattie Noe, and Peggy Light.

# OPINION

## I.

The deceased first met Mrs. Moyers in 2005 or 2006 when Mrs. Moyers began preparing the Vargos' taxes. However, the parties agree that Mrs. Moyers did not become a close friend of the deceased until the deceased's husband passed away in March 2014. Thereafter, Mrs. Moyers spent significantly more time with the deceased. The two women spoke over the telephone frequently. Mrs. Moyers also began driving the deceased to the grocery store and doctor's appointments.

Mr. Moyers did not develop a personal relationship with the deceased until the early months of 2015. He testified that he began visiting the deceased at home in January 2015. The plaintiffs contend that Mr. Moyers did not begin spending time with the deceased until after March 31, 2015. According to Mr. Moyers, he spent considerable time sitting and talking with the deceased, taking her out to eat, and helping her around the house. At least one plaintiff testified that the deceased "loved" both Mr. and Mrs. Moyers. Before this litigation ensued, plaintiffs also asked Mr. Moyers to be a pallbearer at the deceased's funeral.

On April 23, 2015, Mrs. Moyers drove the deceased to the TVA Employees Credit Union, where she helped the deceased open several new bank accounts. At that time, the deceased listed the plaintiffs, in various combinations, as payable-on-death beneficiaries on different accounts. On May 11, 2015, the deceased executed a new general membership agreement with the bank in which she designated Mr. Moyers as the payable-on-death beneficiary. The execution of that document revoked and superseded all prior agreements between the deceased and the bank, thus extinguishing any legal interest the plaintiffs had in the funds. Sometime later, the deceased closed three of the accounts on which most of the plaintiffs had originally been named as beneficiaries. Only four accounts remained open at the time of the deceased's death. Of those four accounts, only one account had previously listed any of the plaintiffs as beneficiaries. Plaintiff Brenda Jarnigan was the original beneficiary on that account.

Mr. and Mrs. Moyers both testified that they had absolutely no involvement with the deceased's decision to name Mr. Moyers as a beneficiary or her decision to close some of her accounts. According to Mr. and Mrs. Moyers, they did not drive the deceased to the bank when she made those changes; nor did they provide the deceased with certain personal information (such as Mr. Moyers's Social Security Number) that would have been required. In fact, Mr. and Mrs. Moyers claim they were unaware that the deceased had named Mr. Moyers as a beneficiary until after the deceased's death. Plaintiffs offer no direct evidence that Mr. and Mrs. Moyers had personal knowledge of the deceased's desire to name

Mr. Moyers as a payable-on-death beneficiary. Nor do the plaintiffs offer evidence that Mrs. Moyers provided the deceased with transportation on her May 11, 2015 trip to the bank. Instead, plaintiffs merely assert that "[Mrs. Moyers] started moving money around and had her husband's name put on a document purporting to trump all of the plaintiffs' beneficiary designations." The plaintiffs also claim that "[i]n all likelihood" the deceased would not have closed some of her other accounts "had [Mrs. Moyers] not interfered."

## II.

Mr. Moyers raises four issues on this appeal, which we have restated slightly:

> Whether the trial court lacked subject matter jurisdiction over this case because of the plaintiffs' alleged lack of standing.

> Whether the trial court erred in declining to grant Mr. Moyers's motion for a directed verdict.

> Whether the trial court erred in finding that Mrs. Moyers exerted undue influence over the deceased.

> Whether the trial court erred in imputing the undue influence to Mr. Moyers.

## III.

### A.

The threshold issue in this case is whether the trial court lacked subject matter jurisdiction. Although Mr. Moyers did not raise this issue before the trial court, parties cannot waive their ability to challenge a court's lack of subject matter jurisdiction. Tenn. R. Civ. P. 12.08. In fact, appellate courts have a responsibility to determine whether subject matter jurisdiction exists "whether or not presented for review." Tenn. R. App. P. 13(b); *see also* **Dishmon v. Shelby State Comm. College**, 15 S.W.3d 477, 480 (Tenn. Ct. App. 1999). This inquiry is a question of law, which we consider de novo. **Chapman v. DaVita, Inc.**, 380 S.W.3d 710, 712-13 (Tenn. 2012) (quoting **Northland Ins. Co. v. State**, 33 S.W.3d 727, 729 (Tenn. 2000)).

Mr. Moyers argues that the trial court lacked subject matter jurisdiction because of the plaintiffs' alleged lack of standing. As Mr. Moyers correctly

observes, lack of standing does not usually defeat a court's subject matter jurisdiction; however, "[w]hen a statute creates a cause of action and designates who may bring an action, the issue of standing is interwoven with that of subject matter jurisdiction and becomes a jurisdictional prerequisite." *Osborn v. Marr*, 127 S.W.3d 737, 740 (Tenn. 2004) (citing *Grom v. Burgoon*, 672 A.2d 823, 824 (Pa Super. Ct. 1996)).

Here, Mr. Moyers argues that a constellation of Tennessee statutes regulating banks and financial institutions creates the plaintiffs' undue influence cause of action. Specifically, Mr. Moyers points to Tenn. Code Ann. §§ 45-2-704, -706, and -710. Section 704 permits the creation of payable-on-death accounts and shields banks from liability when disbursing funds to designated beneficiaries. If a third party challenges the bank's ability to disburse funds to a designated beneficiary, section 706 provides that a bank does not have to recognize the adverse claimant until the claimant can procure a "restraining order, injunction or other appropriate process against the bank from a court of competent jurisdiction." Section 710 places a statute of limitations on when third parties may bring such actions. If the bank so chooses, it may file an interpleader action and ask a court to determine the rights of the relevant parties. Tenn. Code Ann. § 45-2-704(b)(8).

Mr. Moyers's reliance on these statutes is misplaced. Tenn. Code Ann. §§ 45-2-704, -706, and -710 collectively provide protection for financial institutions against third party claims, but the statutes do not independently create a cause action for third parties against designated beneficiaries. The statute of limitations imposed by section 710 and the casual references to "adverse claimants" in section 706 merely shows that interested third parties already had causes of action available to them when the statute was drafted. Indeed, the undue influence cause of action arises from the common law. *See Estate of Glasgow v. Whittum*, 106 S.W.3d 25, 31 (Tenn. Ct. App. 2002) (citing Rest. (Second) of Contracts § 177 (1981)). The origin of this cause of action does not change merely because a party names a bank or financial institution as a co-defendant.[1] Because plaintiffs' undue influence claim arises from the common law and not a statute, the issue of standing is not so "interwoven with that of subject matter jurisdiction" so as to be a "jurisdictional prerequisite." *See Osborn*, 127 S.W.3d at 740.

Accordingly, the "subject matter jurisdiction" issue having been decided adversely to the defendant, we decline to address whether plaintiffs in fact have standing to sue because Mr. Moyers failed to raise that issue before the trial court.

---

[1] Plaintiffs' complaint named both Mr. Moyers and TVA Employees Credit Union as co-defendants. Before trial, however, the court ordered the bank to deposit the disputed funds with the Clerk and Master. The court then dismissed the bank as a party in the lawsuit.

*See* Tenn. R. App. P. 36(a); ***ABN AMRO Mortg. Group, Inc. v. Southern Sec. Federal Credit Union***, 372 S.W.3d 121, 126 (Tenn. Ct. App. 2011) (citations omitted).

**B.**

Next, we consider whether the trial court erred in denying Mr. Moyers's motion for a directed verdict. This is a question of law, which we review de novo with no presumption of correctness. ***In Retreat, LLC v. Crusenberry-Gregg***, No. E2009-02148-COA-R3-CV, 2010 WL 3638796, at *2 (Tenn. Ct. App., filed Sept. 21, 2010). We are also guided by the principles set forth in ***Johnson v. Tennessee Farmers Mut. Ins. Co.***, 205 S.W.3d 365 (Tenn. 2006), wherein our Supreme Court stated:

> In reviewing the trial court's decision to deny a motion for a directed verdict, an appellate court must take the strongest legitimate view of the evidence in favor of the non-moving party, construing all evidence in that party's favor and disregarding all countervailing evidence. A motion for a directed verdict should not be granted unless reasonable minds could reach only one conclusion from the evidence. . . . [A]n appellate court [may not] weigh evidence. Moreover, . . . an appellate court must not evaluate the credibility of witnesses. Accordingly, if material evidence is in dispute or doubt exists as to the conclusions to be drawn from that evidence, the motion must be denied.

***Id.*** at 370 (citations omitted).

Before deciding whether the trial court erred in denying the motion, we must first consider whether the motion was directed at the plaintiffs' undue influence claim, their fraud claim, or both. At the conclusion of plaintiffs' case-in-chief, counsel for Mr. Moyers stated:

> Your Honor, I would move for a directed verdict at this point in time. They've not established a confidential relationship existed. They've certainly not established that Mr. Moyers exercised any dominion and control, and we'd ask that their complaint be dismissed at this time Your, Honor.

After engaging in a discussion about undue influence, the trial court ultimately

- 5 -

denied the defendant's motion.   The court was silent on the issue of fraud.

Although Mr. Moyers did ask for the plaintiffs' "complaint [to] be dismissed," we agree with the plaintiffs that the motion for a directed verdict only related to the issue of undue influence.  Counsel for Mr. Moyers never mentioned fraud in his motion and instead focused on the lack of a confidential relationship and absence of dominion and control, facts necessary to prove undue influence. Furthermore, when the trial court engaged in a discussion of undue influence, counsel for Mr. Moyers never asked the court for further clarification on the issue of fraud.

Nevertheless, because the trial court did not make an express finding on the issue of fraud and because plaintiffs did not present any arguments at trial or in their appellate brief on the issue of fraud, we decline to address the merits of that claim.  *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").   Instead, we proceed to consider whether the trial court erred in denying Mr. Moyers's motion for a directed verdict on the issue of undue influence.

After reviewing the testimony presented prior to the motion and "tak[ing] the strongest legitimate view of the evidence" in favor of the plaintiffs, we cannot say that "reasonable minds could reach only one conclusion" on the issue of undue influence. ***Johnson***, 205 S.W.3d at 370.

## C.

We now turn to the merits of the case, particularly the trial court's finding of undue influence.   Determining whether undue influence has occurred is a question of fact.  ***Cartwright v. Jackson Capital Partners, Limited Partnership***, 478 S.W.3d 596, 607 (Tenn. Ct. App. 2015) (citations omitted).   We must therefore affirm the trial court's finding of undue influence unless the evidence preponderates otherwise. *See* Tenn. R. App. P. 13(d).

We note at the outset that our undue influence jurisprudence has largely developed in the context of will contests; however, we have applied the same principles to disputes regarding payable-on-death bank accounts. *See, e.g.*, ***Frank v. Fields***, No. E2016-00809-COA-R3-CV, 2017 WL 2304301 (Tenn. Ct. App., filed May 26, 2017).   In these cases, a party alleging undue influence has the burden of proving undue influence by either direct or circumstantial evidence. ***Mitchell v. Smith***, 779 S.W.2d 384, 388 (Tenn. Ct. App. 1989).  Because "direct evidence is rarely available," most litigants attempt to prove undue influence by

pointing to "suspicious circumstances" that suggest the deceased did not act freely and independently. *Id.* We have previously stated:

> The suspicious circumstances most frequently relied upon to establish undue influence are: (1) the existence of a confidential relationship between the testator and the beneficiary; (2) the testator's physical or mental deterioration; (3) the beneficiary's active involvement in procuring the will.
>
> Other recognized suspicious circumstances include: (1) secrecy concerning the will's existence; (2) the testator's advanced age; (3) the lack of independent advice in preparing the will; (4) the testator's illiteracy or blindness; (5) the unjust or unnatural nature of the will's terms; (6) the testator being in an emotionally distraught state; (7) discrepancies between the will and the testator's expressed intentions; and (8) fraud or duress directed toward the testator.

*Id.* (citations omitted). "Although there is no prescribed type or number of suspicious circumstances . . . , the doctrine of undue influence is only applicable in Tennessee when it is shown that the person alleged to have exercised undue influence on the testator was in a confidential relationship with the testator." *In re Estate of Link*, No. M2015-02280-COA-R3-CV, 2017 WL 696841, at *7 (Tenn. Ct. App., filed Feb. 22, 2017) (citing *In re Estate of Brevard*, 213 S.W.3d 298, 302 (Tenn. Ct. App. 2006)). Once a party proves that "there is a 'confidential relationship, followed by a transaction wherein the dominant party receives a benefit from the other party, a presumption of undue influence arises, that may be rebutted only by clear and convincing evidence of the fairness of the transaction.'" *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002) (quoting *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995)).

The existence of a confidential relationship is a question of fact. *Matlock v. Simpson*, 902 S.W.2d at 385. Nevertheless, the term "confidential relationship" has a very precise legal meaning. We have previously identified two broad categories of confidential relationships: (1) "legal confidential relationships," where the law imposes fiduciary duties on the dominant party; and (2) "family and other relationships." *Id.* at 385-86. We have repeatedly emphasized that "family and other relationships" are only "confidential" when one party exercises dominion and control over the other party. *E.g.*, *Childress*, 74 S.W.3d at 329 ("The core definition of a confidential relationship requires proof of dominion and control."); *Matlock*, 902 S.W.2d at 386 (" '[F]amily and other relationships', . . .

require proof of the elements of dominion and control[.]"); ***Kelly v. Allen***, 558 S.W.2d 845 (Tenn. 1977) (holding that a normal parent-child relationship is not a confidential relationship absent "elements of dominion and control . . . .").

In this case, the plaintiffs allege, and the trial court held, that Mrs. Moyers had a confidential relationship with the deceased. Nevertheless, there is substantial evidence that the trial court's finding of a confidential relationship was based on an incorrect understanding of that concept. In ruling from the bench, the court stated:

> THE COURT: I don't think dominion and control is required as a finding for a confidential relationship. Are you saying that's one of the elements for a confidential relationship?
>
> MR. GIBBONS [defendant's counsel]: That's correct, Your Honor. Case law says that's a core to a confidential relationship --
>
> THE COURT: Okay.
>
> MR. GIBBONS: -- finding.
>
> THE COURT: Well, I don't think she was grabbing her and beating her head against the wall or anything like that, but she was the one that could get out and run around. She was the one that was providing ideas and assistance on what to do with this – as I recall, she negotiated or stopped the negotiations of a land sale contract, some fellow that was buying a house or . . . something of that nature.
>
> So even though I don't think that's a requirement of a confidential relationship, there were certain things in that relationship wherein Ms. Moyers was the dominant party. And there was an awful lot of money going Ms. – going Ms. Moyers' way, too, it looked like to me from the proof I heard.

Later, the trial court returned to the question of whether a confidential relationship existed:

> THE COURT: And I think that Ms. Dee Dee Moyers

> tearfully testified at the trial that they had become as close as a mother and a daughter. So you can tell from that, that that relationship did get beyond just a bookkeeper relationship. That's why I find it's a confidential relationship. . . .

These statements strongly indicate that the trial court's finding of a confidential relationship was fundamentally flawed. The court, by its own admission, did not realize that exercise of dominion and control is the *core* element of a confidential relationship. The court also equated a mother-daughter relationship with a confidential relationship, a conclusion our precedents clearly reject. *See Kelly*, 558 S.W.2d 845.

Failing to inquire into the extent of Mrs. Moyers's alleged dominion and control, the trial court instead concluded that a confidential relationship existed because Mrs. Moyers talked with the deceased on a regular basis, provided the deceased with transportation, cashed checks and made ATM withdrawals for the deceased, provided ideas about financing a "rent to own" house for the deceased's former handyman, and collected rent from that handyman. Mr. Moyers correctly observes that most of these activities occurred months *after* the deceased changed the beneficiary status on her bank accounts. The only activities occurring *before* the beneficiary change were the frequent conversations between Mrs. Moyers and the deceased, Mrs. Moyers's willingness to cash checks on behalf of the deceased, and Mrs. Moyers's willingness to provide the deceased with transportation. Plaintiffs also highlight the fact that Mrs. Moyers drove the deceased to the bank when she initially created her accounts. Mrs. Moyers also listed her personal email address on the account. None of these activities, individually or collectively, amount to the exercise of dominion and control.

To prove the presence of dominion and control, one must point to evidence that the dominant party "destroy[ed] the free agency" of the weaker party. *See Matlock*, 902 S.W.2d at 385 (citing *Kelly v. Allen*, 558 S.W.2d 845 (Tenn. 1977)). In *Kelley v. Johns*, for example, we found that a son exercised dominion and control over his father. 96 S.W.3d 189, 197 (Tenn. Ct. App. 2002). The father in that case moved in with his son and daughter-in-law after the death of his wife. *Id.* at 192. Eventually, the father's mental and physical health began to deteriorate. *Id.* at 193. He suffered from various ailments that required hospitalization. *Id.* He also experienced "bouts of anxiety and confusion" and had "delusions" about his deceased wife. *Id.* The father depended on his son for all his daily needs, including food, shelter, transportation, and maintenance of the family farm. *Id.* at 192. To facilitate his son's caregiving responsibilities, the father added his son as a joint owner of his bank account and authorized him to use the account to write checks to himself and others. *Id.* We held that the son's

"unrestrained access to his father's assets, coupled with the undisputed evidence of the decline in his father's physical and mental health and increased dependence on his son and daughter-in-law, provide material evidence to support the jury's finding that a confidential relationship existed . . . ." *Id.* at 197-98.

Here, Mrs. Moyers did not have "unrestrained access" to the deceased's financial assets in the months leading up to the beneficiary change. At most, the deceased occasionally gave Mrs. Moyers permission to cash checks and to use her ATM card to make cash withdrawals, which Mrs. Moyers would immediately deliver to the deceased. Plaintiffs stress that Mrs. Moyers's email address was listed on the deceased's bank account. Plaintiffs also point to the testimony of Mr. Squires, one of the deceased's co-executors, who stated that the deceased was concerned about unauthorized online purchases. Mrs. Moyers, on the other hand, testified that the deceased wanted to use her email address so the deceased could conduct online banking through Mrs. Moyers's iPad. According to Mrs. Moyers, the deceased operated the iPad independently because "she didn't like everybody knowing her business, and she wanted to do it herself." Mrs. Moyers even deleted the online banking application each time the deceased was finished using it. The trial court specifically found Mr. Squire's testimony to be incredible and stated that it "would probably believe Ms. Moyers over him . . . ."

Additionally, the deceased was not experiencing the kind of mental deterioration that led to a finding of dominion and control in *Kelley*. In a deposition, Dr. Ramaprasad testified that the deceased was "her normal self" when he saw her on the day before her death. He also stated that he had never known the deceased to have any competency issues since he had begun treating her in 2004. The plaintiffs themselves do not dispute the deceased's mental capacity and offered no evidence tending to show that the deceased was easily manipulated.

In *Johnson-Murray v. Burns*, we held that the deceased was *not* subject to the dominion and control of her stepson and his wife, even though the deceased relied upon them

> to bring her food, to clean her home, to bathe her, to dress her, to take her to doctor's appointments, to give her the medications she required, to pay her bills, to keep her yard orderly, and to make repairs on the home. . . . [The deceased's stepson also] install[ed] a gate at the entrance of her driveway and require[ed] visitors to obtain . . . permission to visit her.

525 S.W.3d 625, 636 (Tenn. Ct. App. 2017). Although the court in *Burns* admitted the relevance of those facts, the court ultimately concluded that "there

- 10 -

[was] evidence to support the [jury's] finding that the Defendants did not exercise dominion and control over her." ***Id.*** For example, one witness testified that he never had a problem visiting the deceased after the gate was installed. ***Id.*** That witness also testified that "he could not talk [the deceased] into something she did not want to do." ***Id.*** Another witness testified that the deceased "was cognizant of what was going on and still 'sharp' when she [wrote her will]." ***Id.*** Further, the deceased's primary care physician testified that the deceased was in good mental condition during the relevant time period. ***Id.*** at 637. Taken together, this testimony suggested that the deceased acted freely and independently and was not subject to the dominion and control of her stepson. *See **id.***

In the present case, Mrs. Moyers provided services similar to that of the defendants in ***Burns***. Mrs. Moyers took the deceased to the grocery store and to doctor's appointments; she sometimes organized the deceased's medication; she also cashed checks, collected rent, and made ATM withdrawals for the deceased. But the trial court, like the court in ***Burns***, specifically found that the deceased was capable of making her own decisions:

> The COURT: Well, I don't think that anybody proved [the deceased] incapable of making her own decisions. I think that she had the mental capacity to do what she did.

If the deceased was mentally competent to manage her own affairs, it is unlikely that someone exerted dominion and control over her finances. Absent any evidence to the contrary, we cannot say that Mrs. Moyers exercised dominion and control over the deceased merely because she provided companionship and assistance with transportation and technology. Because Mrs. Moyers did not exercise dominion and control over the deceased, we conclude that the evidence preponderates against the trial court's finding that Mrs. Moyers and the deceased had a confidential relationship.

As previously stated, "the doctrine of undue influence is only applicable in Tennessee when it is shown that the person alleged to have exercised undue influence on the testator was in a confidential relationship with the testator." ***In re Estate of Link***, 2017 WL 696841, at *7. Because we conclude that no confidential relationship existed, the plaintiffs' undue influence claim fails. It is therefore unnecessary for us to decide whether the trial court erred in imputing the presumption of undue influence to Mr. Moyers.

## IV.

The judgment of the trial court is reversed. Costs on appeal are assessed to

the appellees, Barbara Jarnigan, Wanda Lovin, Mattie Noe, and Peggy Light.  The case is remanded to the trial court, pursuant to applicable law, for further proceedings.

 

_____
CHARLES D. SUSANO, JR., JUDGE