IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 25, 2026 Session

## ANTHONY D. WALSH V. TIMOTHY ALLEN WALSH

**Appeal from the Chancery Court for Anderson County**
**No. 22CO122      Daniel Forrester, Chancellor**

———————————————————

**No. E2025-00791-COA-R3-CV**

———————————————————

In this case, two brothers accused each other of exerting undue influence on their aging mother, Latona Joyce Walsh.  Timothy Walsh ("Defendant") alleged that his brother Anthony Walsh ("Plaintiff") had exerted undue influence over Ms. Walsh, resulting in her deeding her home to him, naming him as the executor of her estate, and placing his name on her bank accounts approximately four years before her death.  Shortly before her death, Ms. Walsh made Defendant her attorney-in-fact and Plaintiff's name was removed from her accounts.  Plaintiff filed a complaint alleging that Defendant had exerted undue influence over Ms. Walsh, and Defendant filed a counterclaim against Plaintiff for undue influence. Ms. Walsh died two days later.  The Chancery Court for Anderson County ("the Trial Court") found that both sons had exerted undue influence over their mother but that Defendant had not dissipated any of her assets, unlike Plaintiff.  The Trial Court accordingly ordered that Ms. Walsh's home was part of her estate and was to be distributed by the terms of her 1991 will.  The Trial Court further credited Plaintiff with receiving $49,000 in rental income from renting his mother's home after her death.  Plaintiff appeals the Trial Court's finding of undue influence.  Based upon our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

D. KELLY THOMAS, JR., SP. J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and KRISTI M. DAVIS, JJ., joined.

Matthew A. Grossman and Rebekah P. Harbin, Knoxville, Tennessee, for the appellant, Anthony D. Walsh.

H. Douglas Nichol, Knoxville, Tennessee, for the appellee, Timothy Allen Walsh.

# OPINION

# BACKGROUND

Plaintiff filed a complaint for declaratory judgment and injunctive relief against Defendant and a petition for appointment of a conservator for his mother in the Trial Court in April 2022. In his complaint, Plaintiff explained that his mother, Ms. Walsh, had been in declining physical and cognitive health for a number of years and had become bedridden and suffered from dementia and "organic brain impairment." Ms. Walsh had recently been placed on in-home hospice care.

Plaintiff alleged that he had cared for his mother for many years and that Ms. Walsh had appointed him as her attorney-in-fact in 2018 when she still had most of her cognitive abilities. Ms. Walsh also had Plaintiff set up an investment account to facilitate his ability to manage her financial matters for her. She also added his name to her credit union accounts, and unbeknownst to him, had lawyer Robert Knolton prepare a quitclaim deed conveying her home to Plaintiff, while reserving a life estate ("2018 Deed").

Plaintiff alleged that Defendant began living with Ms. Walsh in January 2022. Defendant allegedly became angry and suspicious when he learned that Plaintiff had been added to Ms. Walsh's accounts. Around this time, Defendant also learned of the 2018 Deed. Plaintiff alleged that Defendant had "procured their mother's purported signature on an instrument appearing to appoint him as her attorney-in-fact," revoking her alleged appointment of Plaintiff. Plaintiff further alleged that Defendant changed the locks on Ms. Walsh's residence, refused Plaintiff entry into Ms. Walsh's home, prevented Plaintiff from contacting Ms. Walsh, and removed Plaintiff's name from Ms. Walsh's accounts. Plaintiff claimed that he did not know about the 2018 Deed until he received a letter from Defendant's attorney in April 2022.

Plaintiff asked the Trial Court to declare Ms. Walsh's appointment of Defendant as her attorney-in-fact void given her lack of mental capacity, the confidential relationship between Ms. Walsh and Defendant, and the suspicious circumstances surrounding the power of attorney. He also requested mandatory injunctive relief to restore his ability to contact Ms. Walsh. Ms. Walsh passed away two days after Plaintiff filed his complaint.

In October 2022, Defendant filed an answer and counterclaim against Plaintiff. Defendant admitted that Ms. Walsh had experienced physical and memory problems due to advancing age. He explained that Ms. Walsh had been hospitalized in December 2021 and had requested that Defendant reside with her to take care of her.

Defendant denied that Plaintiff did not know about the 2018 Deed and alleged that the 2018 Deed was the result of Plaintiff's undue influence on Ms. Walsh. Defendant further alleged that Ms. Walsh made Defendant her attorney-in-fact when she discovered

that Plaintiff had written numerous checks to himself from her accounts and had made himself the sole beneficiary of her investment accounts.

Defendant alleged that Ms. Walsh executed a will in 1991 ("1991 Will"), naming her late husband and Plaintiff's and Defendant's father, James Walsh, as the executor and Defendant as alternate executor. After the death of James Walsh in 2017, Plaintiff allegedly "had himself appointed as attorney in fact" for Ms. Walsh. Defendant alleged that Plaintiff took actions to divest Defendant of his inheritance by adding his name to various bank accounts, insurance policies, and investment accounts as co-owner and sole beneficiary.

Defendant further alleged that as Ms. Walsh's alleged attorney-in-fact, Plaintiff wrote checks from Ms. Walsh's accounts to himself for his own personal expenses and transferred over $200,000 from an annuity owned by Ms. Walsh to a Charles Schwab investment account, making himself co-owner and sole beneficiary.

Defendant alleged that Ms. Walsh had expressed concerns with Plaintiff's actions in January 2022 and as a result appointed Defendant as her attorney-in-fact. Defendant asserted that he tried to reverse Plaintiff's actions with respect to Ms. Walsh's bank accounts, took such actions in accordance with Ms. Walsh's wishes to protect her assets, and had not used any of these accounts for his personal use. Defendant claimed that Plaintiff had breached his fiduciary duties to Ms. Walsh, her estate, and Defendant as a beneficiary. Defendant asked the Trial Court to void the transfers of ownership and beneficiary designations made by Plaintiff as well as the 2018 Deed.

As these proceedings progressed, it became clear that Ms. Walsh had never appointed Plaintiff as her attorney-in-fact but rather made him only executor of her estate through a codicil executed in the fall of 2017 ("2017 Codicil"), with the help of Robert Knolton. Nevertheless, Plaintiff had drafted a power of attorney to appoint himself as his mother's attorney-in-fact, but this power of attorney was never executed.

A four-day trial was held in January and April of 2025. Three key documents were entered into evidence as exhibits: the 1991 Will dividing her estate between Plaintiff and Defendant equally; the 2017 Codicil naming Plaintiff as her executor; and the 2018 Deed.

Plaintiff testified that Ms. Walsh used the services of Mr. Knolton to determine whether her husband's estate needed to be probated. Plaintiff made an appointment with Mr. Knolton for her to execute the 2017 Codicil appointing him executor of her estate. On cross-examination, Plaintiff testified that he had contacted Mr. Knolton because he had dealt with him before and his firm had represented him in other matters. Plaintiff did not tell Defendant about the 2017 Codicil because Ms. Walsh told him not to do so.

Plaintiff testified that he became more active in Ms. Walsh's finances after his father died in 2017 because his father had generally handled the finances. Although she kept detailed notebooks of her financial records after her husband's death, Ms. Walsh needed help paying bills online. Plaintiff stated that his name was added to Ms. Walsh's Enrichment Federal Credit Union account in the fall of 2017 so that he could write checks and pay bills for her. Plaintiff explained that he did not take over managing her account but rather simply helped her with that account. He did not tell Defendant about the change to her account because his mother requested he not do so.

On January 31, 2018, Ms. Walsh went to Mr. Knolton's office to execute the 2018 Deed. Plaintiff denied knowing about the 2018 Deed until it was brought to his attention by Defendant's lawyer in April 2022. Ms. Walsh's diary entry from that day demonstrated that Plaintiff was at her house twice the day she executed the 2018 Deed. Plaintiff testified that he never suggested to his mother that she should deed her home to him. He also stated that his mother never told him that she wanted him to own her home or that she was gifting her home to him.

In addition, Plaintiff testified that he closed out his mother's Athena annuity and transferred the funds to a Charles Schwab account at his mother's request. He testified that he made himself a joint tenant on the account and that he did not think of adding Defendant to the account. He also made himself the beneficiary. When asked if his mother gave him permission to be made a beneficiary on any of her accounts, Plaintiff responded: "As executor I needed -- I made myself a beneficiary based on talking with mom. Since I was the executor, we discussed it and I was the beneficiary." He also added his name as a beneficiary to a Voya account, his late father's retirement account, explaining that he needed to be designated the beneficiary because he was his mother's executor. His brother was not named as a beneficiary.

When asked if he ever had a discussion with Ms. Walsh about being the co-owner or beneficiary on these accounts, he stated that he could not recall. Later, he stated that his mother never told him to be a co-owner or the sole beneficiary of her accounts. Plaintiff also affirmed that Ms. Walsh depended on his advice and help in taking care of her financial affairs. He testified that he believed his mother trusted him to help her with her financial affairs.

Plaintiff also testified that Ms. Walsh gave him one of her checkbooks in 2017 or 2018. Many checks written out to Plaintiff from Ms. Walsh's Enrichment account were entered into evidence. One check for $1,000 was made out to Plaintiff for his living expenses. This check was signed by Plaintiff and dated April 2021. A check for $300 written out to Plaintiff from Ms. Walsh's Enrichment account in July 2018. Plaintiff signed the check. The memo line is blank, and Plaintiff could not recall what this was for. When asked if he spent all the funds in the Charles Schwab account, Plaintiff answered: "Yes.

After I was terminated [from my job], my family and I lived on that" after his mother's death.

Mr. Knolton testified via deposition that he started doing a few things for Ms. Walsh at her request after her husband died. He explained that he helped her with some IRS, TennCare, or Medicare forms and ultimately helped her with the 2017 Codicil. Mr. Knolton testified that he could not recall whether Ms. Walsh explained why she wanted to change the executor of her estate from Defendant to Plaintiff. Mr. Knolton stated that either Plaintiff or Ms. Walsh had called him about creating the 2017 Codicil. During his deposition, Defendant's counsel showed Mr. Knolton emails between himself and Plaintiff discussing what Ms. Walsh would need to do to execute the codicil. Mr. Knolton explained that his understanding was that he was creating the 2017 Codicil at Ms. Walsh's request.

Mr. Knolton further testified that Ms. Walsh called him to discuss deeding her home to Plaintiff. When asked whether Plaintiff had anything to do with the 2018 Deed, Mr. Knolton stated: "Not that I know of or can recall." He also stated that there was nothing wrong with Ms. Walsh's mental capacity "as far as [he] ever observed" and that she was of good mind and knew what she was doing whenever he met with her. He could not recall if Ms. Walsh ever explained why she wanted to execute the 2018 Deed in Plaintiff's favor. Mr. Knolton stated that there was no indication that Ms. Walsh was under the influence of anyone else. When asked about email communications with Plaintiff in 2017, Mr. Knolton responded: "I did not know specifically what was going on other than I did what I was told to by Mrs. Walsh."

Defendant stated that he went with Ms. Walsh to meet with Mr. Knolton after his father died to discuss his father's will. Defendant testified that in January or February 2022, Ms. Walsh had Plaintiff brief Defendant on her finances, and Defendant found that there were a couple of things that concerned him and Ms. Walsh. He found it odd that Plaintiff had invested Ms. Walsh's money in an S&P index fund given his mother's age and health. Defendant and Ms. Walsh then discovered Plaintiff's other actions with regard to her finances. Worried that Plaintiff might admit her to a nursing home, Ms. Walsh executed a new codicil ("2022 Codicil"), leaving her home to Defendant and naming Defendant co-executor with Plaintiff. Ms. Walsh also executed a power of attorney designating Defendant as her attorney-in-fact.

According to Defendant, she never mentioned the 2018 Deed to him, and he did not know why she would have executed the 2018 Deed. When he asked his mother about the 2018 Deed, she stated that she did not recall it and stated that if she signed something like that, she did not understand what she was signing.

Defendant recounted when he and Ms. Walsh confronted Plaintiff about his actions as follows:

- 5 -

A. Okay. So, I was in talking with mom or sitting or her bed -- her hospital bed, she was in her hospital bed, I was sitting on her regular bed. [Plaintiff] came in from mowing the lawn. He came and sat down on the -- there was a couch under the window on the other side of the hospital bed.

* * *

And so I said, I've been reviewing some of the transactions on mom's credit union account and there's a couple of checks that I would like to ask you about.

There's a check dated April 18 of 2021 for $1,000 that you wrote to yourself and a check on April 20 for $4,500 from mom to you.

Can I ask what those two checks were for? And he said, Personal expenses.

And I said, Well, what sort of personal expenses? And he said, That's none of your business.

And I said, Are you planning to repay her -- pay her back for those? And he said, That's none of your business.

And I said, Well, I think it's some of my business because mom has me being her power of attorney and I've been reviewing and there are some transactions on her account that are questionable; it's just your name and hers on the Schwab account; you're the sole beneficiary of the Voya account and you have a quitclaim deed.

You had her sign a quitclaim deed deeding the house to you.

Q. Are you sure that you mentioned the quitclaim deed on this April 2nd meeting to him?

A. Oh, yes, sir. That was at the point that he erupted.

Q. And what happened?

A. Okay. So, I mentioned the quitclaim deed. Your Honor, I'm going to quote. He said, quote, Get the fuck out; you get the fuck out, unquote, and he jumped up and he took a couple of steps toward my mom and, yes, the rails were up but they weren't that high, nor did they go all the way to the top of the bed. He leaned in and he said, quote, Mom, get him the fuck out; get him the fuck out, unquote.

Defendant testified that Ms. Walsh was "visibly shaken," "very upset," and "very scared" after her next meeting with Plaintiff.

Defendant characterized Ms. Walsh as a fighter and an independent person. Ms. Walsh suffered a severe back injury in 2012 and was using a walker by the time her husband died in 2017. She was diagnosed with congestive heart failure in 2000 and suffered a hiatal hernia in 2018. She began having help from home health caregivers in 2020. She first started to suffer from hallucination-inducing urinary tract infections in 2020. She was still driving her car into 2020.

Defendant's friend, Amanda Selvy, testified that she realized Plaintiff was involved in Ms. Walsh's affairs on the day Ms. Walsh's husband died in 2017. She stated that Plaintiff was "bossing her around, telling her what to do and when to do it and she was very frightened and rushing around doing what he said to do." Ms. Selvy reported that Ms. Walsh was sad after her husband died and that she no longer laughed or made jokes like she used to. Before her husband's death, Ms. Walsh did not handle any of her own financial affairs. However, Ms. Selvy testified that Ms. Walsh was as "sharp as a tack" when she was not suffering from urinary tract infections.

In May 2025, the Trial Court entered its final judgment. The Trial Court found that the power of attorney in favor of Defendant and transfers of Ms. Walsh's accounts into Defendant's name were the result of undue influence. The Trial Court likewise found that the transactions in favor of Plaintiff were the result of undue influence.

With respect to Plaintiff, the Trial Court made the following findings of fact:

> In this case, the facts show that a confidential relationship existed between [Plaintiff] and Latona Walsh. Latona Walsh always relied upon her husband to handle her financial affairs and shortly after his passing she then relied upon [Plaintiff] to handle her financial affairs. In addition to handling her financial affairs, [Plaintiff] then added himself as co-owner or beneficiary to essentially the entire estate of Latona Walsh. Further, in addition money was paid directly to [Plaintiff] on various occasions from his mother's account. [Plaintiff] testified that these transactions to him were for "living expenses."

> In addition to the establishment of a confidential relationship and transactions to the benefit of [Plaintiff], the court analyzed the suspicious factors as set forth above and found the following suspicious factors present concerning these transactions: (1) That there was a confidential relationship between [Plaintiff] and Latona Walsh as stated above, (2) That Ms. Walsh was approximately eighty-two (82) years of age, and had suffered from

numerous health issues, including but not limited to mobility issues, severe UTI's, and in 2022 dementia and related issues, (3) That the transactions, account ownership changes, and quitclaim deed were executed without the knowledge of Tim Walsh, (4) The unjust nature of the transactions by nature of disinheriting Tim Walsh from the estate, (5) Ms. Walsh had just lost her lifelong spouse, and the Court finds that she would have been emotionally distraught, (6) The transactions between herself and [Plaintiff] do not reflect the intentions as stated in her 1991 will which would have left her estate equally to both of her children.

The Court finds that a confidential relationship existed between Latona Walsh and [Plaintiff], that [Plaintiff] subsequently benefited from numerous transactions, and that numerous suspicious circumstances were present at the time of the transactions [and] is of the opinion and finds that there is a presumption of undue influence regarding each of the above transactions.

The burden now shifts to Plaintiff/Counter-Defendant Tony Walsh to prove the fairness of the above transactions by clear and convincing evidence. *In re Est. of Price*, 273 S.W.3d 113, 125 (Tenn. Ct. App. 2008).

The Plaintiff/Counter Defendant argues that the 2018 quit claim deed is not the product of undue influence by Plaintiff since Plaintiff did not know about the quit claim deed until its discovery in 2022. Counsel for Plaintiff relies on the case of *ORNL Federal Credit Union v. Estate of Helen D. Turley*, [No. E2019-00861-COA-R3-CV,] 2020 WL 1652573, [(Tenn. Ct. App. Apr. 3, 2020)] an unpublished case originating in this same Court. In *Turley*, one of the decedent's adult children took her to the bank, where she designated that person as Payable on Death ("POD") beneficiary of the account for a substantial sum of money. Summary judgment was granted on behalf of the heir dismissing the complaint of undue influence against him.

In this case, the Plaintiff contends that he did not know about the appointment for the quitclaim deed and argues this is similar to *Turley*, and that he was only at Ms. Walsh's home that evening to fix the ink cartridge in her printer. The Plaintiff introduced an exhibit showing the receipt for the ink cartridge from 2018 with a purchase time of 5:50p.m. on the date in question. (Exhibit 35). Also introduced at trial was an entry from a daily calendar kept by Ms. Walsh that had entries on the date the quitclaim deed was executed. (Exhibit 14). On January 31, 2018, Ms. Walsh made entries in her calendar showing her 10:00a.m. appointment with Robert Knolton, she also notes immediately below that "Tony and son over" and another subsequent entry of Tony being over 'with ink cartridge." (Exhibit 14).

[Plaintiff] testified that his mother kept meticulous notes and introduced notebooks as an example of Ms. Walsh's work in keeping notebooks about her bills and expenses. (Exhibits 41 and 42).

*Turley* is distinguishable from the case at hand in that the trial court in *Turley* did not find the heir in question that received the POD account to be in a confidential relationship with his mother. However, the Court in this case, as previously addressed, does find that the Plaintiff Tony Walsh did have a confidential relationship with his mother. In *Turley*, the heir that received the benefit did not live with his mother or help take care of her. However, in this case, not only did the Plaintiff help her with her financial and daily affairs, he also subsequently made himself the beneficiary or owner of virtually all the assets of Ms. Walsh.

[Plaintiff] also downplayed his involvement with his mother's estate. [Plaintiff] testified at trial that he did not know what a quit claim deed was until he looked it up in 2022. Despite his claim of limited knowledge, he also prepared a power of attorney that was never executed that would have made him power of attorney over Ms. Walsh. This was found in Ms. Walsh's home. [Plaintiff] was also aware and made the initial phone call for his mother to have the first codicil executed naming him executor over Ms. Walsh's estate. Further, the Court noted that it appears from Ms. Walsh's records that he was at the home immediately after the deed was executed, and again later that evening. The Court did not find [Plaintiff] credible when he testified about his lack of knowledge concerning the quitclaim deed, or its existence, nor the fact that he testified he was only at Ms. Walsh's home one time that day later in the evening on the date the deed was executed, which was in contradiction to the calendar left by Ms. Walsh. Further, the Court felt that [Plaintiff] attempted to downplay his involvement in matters concerning his mother's estate, but in reality, Mr. Walsh had prepared a power of attorney for Ms. Walsh (was not executed) and was aware of her first codicil. The evidence surrounding these events, and the unsigned power of attorney indicate to the Court that [Plaintiff] was more involved with the above transactions than portrayed to the Court.

Therefore, the Court finds that the Plaintiff, Tony Walsh, failed to rebut the presumption of undue influence regarding the fairness of the above transactions by clear and convincing evidence.

The Trial Court ordered that Ms. Walsh's home was part of her estate and was to be distributed according to the terms of the 1991 Will. The Trial Court further found that after Ms. Walsh passed away and Defendant moved out of her residence, Plaintiff rented the home to his son and received $49,000 in rental income. The Trial Court credited Plaintiff

with already receiving $49,000 in estate funds from the rental income but also ordered that the property taxes and insurance paid for the property from January 2023 forward may be offset against the $49,000.  Plaintiff appeals.

## DISCUSSION

Although Plaintiff has raised multiple issues for review, we have consolidated these issues into one dispositive issue: whether the Trial Court erred in finding that the 2018 Deed was the result of Plaintiff's undue influence over Ms. Walsh.

The standard of review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise.  Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001).  A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness.  *S. Constructors, Inc. v. Loudon Cnty. Bd. of Educ.,* 58 S.W.3d 706, 710 (Tenn. 2001).  "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

With respect to undue influence, this Court has explained:

Determining whether undue influence has occurred is a question of fact. *Cartwright v. Jackson Capital Partners, Limited Partnership*, 478 S.W.3d 596, 607 (Tenn. Ct. App. 2015) (citations omitted).  We must therefore affirm the trial court's finding of undue influence unless the evidence preponderates otherwise.  *See* Tenn. R. App. P. 13(d).

We note at the outset that our undue influence jurisprudence has largely developed in the context of will contests; however, we have applied the same principles to disputes regarding payable-on-death bank accounts. *See, e.g.*, *Frank v. Fields*, No. E2016-00809-COA-R3-CV, 2017 WL 2304301 (Tenn. Ct. App., filed May 26, 2017).  In these cases, a party alleging undue influence has the burden of proving undue influence by either direct or circumstantial evidence.  *Mitchell v. Smith*, 779 S.W.2d 384, 388 (Tenn. Ct. App. 1989).  Because "direct evidence is rarely available," most litigants attempt to prove undue influence by pointing to "suspicious circumstances" that suggest the deceased did not act freely and independently. *Id.*  We have previously stated:

The suspicious circumstances most frequently relied upon to establish undue influence are: (1) the existence of a confidential relationship between the testator and the

beneficiary; (2) the testator's physical or mental deterioration; (3) the beneficiary's active involvement in procuring the will.

Other recognized suspicious circumstances include: (1) secrecy concerning the will's existence; (2) the testator's advanced age; (3) the lack of independent advice in preparing the will; (4) the testator's illiteracy or blindness; (5) the unjust or unnatural nature of the will's terms; (6) the testator being in an emotionally distraught state; (7) discrepancies between the will and the testator's expressed intentions; and (8) fraud or duress directed toward the testator.

*Id.* (citations omitted). "Although there is no prescribed type or number of suspicious circumstances . . . , the doctrine of undue influence is only applicable in Tennessee when it is shown that the person alleged to have exercised undue influence on the testator was in a confidential relationship with the testator." *In re Estate of Link*, 542 S.W.3d 438, 452 (Tenn. Ct. App., 2017) (citing *In re Estate of Brevard*, 213 S.W.3d 298, 302 (Tenn. Ct. App. 2006)). Once a party proves that "there is a 'confidential relationship, followed by a transaction wherein the dominant party receives a benefit from the other party, a presumption of undue influence arises, that may be rebutted only by clear and convincing evidence of the fairness of the transaction.'" *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002) (quoting *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995)).

The existence of a confidential relationship is a question of fact. *Matlock v. Simpson*, 902 S.W.2d at 385. Nevertheless, the term "confidential relationship" has a very precise legal meaning. We have previously identified two broad categories of confidential relationships: (1) "legal confidential relationships," where the law imposes fiduciary duties on the dominant party; and (2) "family and other relationships." *Id.* at 385-86. We have repeatedly emphasized that "family and other relationships" are only "confidential" when one party exercises dominion and control over the other party. *E.g.*, *Childress*, 74 S.W.3d at 329 ("The core definition of a confidential relationship requires proof of dominion and control."); *Matlock*, 902 S.W.2d at 386 ("'[F]amily and other relationships', . . . require proof of the elements of dominion and control[.]"); *Kelly v. Allen*, 558 S.W.2d 845 (Tenn. 1977) (holding that a normal parent-child relationship is not a confidential relationship absent "elements of dominion and control. . . .").

*Jarnigan v. Moyers*, 568 S.W.3d 585, 591-92 (Tenn. Ct. App. 2018).

This Court has explained the concept of "dominion and control" as follows:

Confidential relationships can assume a variety of forms, and thus the courts have been hesitant to define precisely what a confidential relationship is. *Robinson v. Robinson*, 517 S.W.2d 202, 206 (Tenn. Ct. App. 1974). In general terms, it is any relationship that gives one person the ability to exercise dominion and control over another. *Givens v. Mullikin ex rel. Estate of McElwaney*, 75 S.W.3d 383, 410 (Tenn. 2002); *Childress v. Currie*, 74 S.W.3d [324] at 328 [(Tenn. 2002)]; *Mitchell v. Smith,* 779 S.W.2d [384] at 389 [(Tenn. Ct. App. 1989)]. It is not merely a relationship of mutual trust and confidence, but rather it is one

> where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with ability, because of that confidence, to influence and exercise dominion and control over the weaker or dominated party.

*Iacometti v. Frassinelli*, 494 S.W.2d 496, 499 (Tenn. Ct. App. 1973).

Fiduciary relationships are confidential per se because of the legal status of the parties. They automatically give rise to a presumption of undue influence with regard to transactions that benefit the fiduciary. Examples of such fiduciary relationships include that between guardian and ward, attorney and client, or conservator and incompetent. *Kelly v. Allen,* 558 S.W.2d 845, 848 (Tenn. 1977); *Mitchell v. Smith,* 779 S.W.2d at 389; *Parham v. Walker,* 568 S.W.2d 622, 625 (Tenn. Ct. App. 1978). Relationships not fiduciary in nature, even those that are inherently confidential, such as those between family members, are not confidential per se and require proof of the elements of dominion and control in order to establish the existence of a confidential relationship. *Matlock v. Simpson,* 902 S.W.2d [384] at 385-86 [(Tenn. 1995)]; *Kelly v. Allen,* 558 S.W.2d at 848.

Accordingly, evidence that two persons are members of the same family, without more, lends no support to an undue influence claim. Proof that one family member exercised dominion and control over another establishes the existence of a confidential relationship but does not make out a prima facie claim of undue influence. In addition to proving the existence of a confidential relationship between two family members, a will's contestant must establish at least one other suspicious circumstance, such as a transaction benefitting the dominant party in the confidential relationship.

*Kelley v. Johns*, 96 S.W.3d 189, 197 (Tenn. Ct. App. 2002) (footnote omitted).

Plaintiff first argues that the Trial Court erred by finding a confidential relationship because Ms. Walsh was not suffering mental deterioration at the time of the 2017 Codicil and 2018 Deed. However, mental deterioration is not necessarily required to demonstrate the existence of a confidential relationship. Our Supreme Court has previously explained:

> In line with these authorities we hold that the normal relationship between a mentally competent parent and an adult child is not per se a confidential relationship and raises no presumption of the invalidity of a gift from one to the other. In order for such a presumption to arise there must be a showing that there were present the elements of dominion and control by the stronger over the weaker, <u>or</u> there must be a showing of senility or physical and mental deterioration of the donor or that fraud or duress was involved, <u>or</u> other conditions which would tend to establish that the free agency of the donor was destroyed and the will of the donee was substituted therefor.

*Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977) (emphasis added).

Senility or physical and mental deterioration is simply one way for a party to demonstrate a confidential relationship. As this Court has previously put it: "the question to be answered is not whether the weaker party's decision was a good one, or even whether he knew what he was doing at the time. In these cases, the courts must determine whether the weaker party's decision was a free and independent one or whether it was induced by the dominant party." *Williamson v. Upchurch*, 768 S.W.2d 265, 270 (Tenn. Ct. App. 1988).

Plaintiff cites *Jarnigan v. Moyers*, 568 S.W.3d 585 (Tenn. Ct. App. 2018) in support of his argument that Defendant failed to prove a confidential relationship because Ms. Walsh was not experiencing mental deterioration. Plaintiff is correct that the *Jarnigan* Court considered the donor's lack of mental deterioration in concluding that there was no confidential relationship between the donor and the donee. *Id.* at 592-94. However, the donor's mental state was one of several factors that led the *Jarnigan* Court to its conclusion that the donee did not exercise dominion and control over the donor. The *Jarnigan* Court considered the following: the only activities that took place before the donee was named as beneficiary were her frequent conversations with the donor and the donee's willingness to cash checks on the donor's behalf and provide the donor with transportation; the donee did not have unrestrained access to the donor's financial assets; the donor gave the donee permission to cash checks and make cash withdrawals at the ATM, which the donee would immediately deliver to the donor; and the donee merely provided the donor companionship and assistance with transportation and technology. *Id.*

We agree with Plaintiff that the Trial Court erred in considering Ms. Walsh's later-developed dementia and urinary tract infections when determining whether suspicious circumstances surrounded the 2017 Codicil and 2018 Deed. Nevertheless, this error was

harmless as the Trial Court primarily considered Ms. Walsh's past reliance on her husband to handle the finances; her reliance on Plaintiff to handle her financial matters after her husband's death; and Plaintiff's self-serving actions with Ms. Walsh's finances. We discern no reversible error in the Trial Court's determination.

We first note that the Trial Court did not find Plaintiff credible. The Trial Court found that Plaintiff downplayed his involvement in Ms. Walsh's finances and did not find his claim of ignorance of the 2018 Deed credible. We will not re-evaluate a trial court's credibility findings absent clear and convincing evidence. *Wells*, 9 S.W.3d at 783. In addition, Ms. Selvy testified that she realized that Plaintiff was involved in Ms. Walsh's affairs the day her husband died, witnessing Plaintiff boss Ms. Walsh around, telling her what to do and when to do it, and frightening her.

Furthermore, although there was no evidence of Ms. Walsh's mental deterioration in 2017 and 2018, she obviously felt the need for help with managing her finances, handling online banking, and writing checks. As a result, she relied on and trusted Plaintiff to assist her in managing her affairs, having relied on her husband throughout their marriage for the same. Despite this trust, by Plaintiff's own admission, he went beyond her instructions by making himself co-owner on her financial accounts and making himself the only beneficiary of these accounts.

This interaction between Defendant's counsel and Plaintiff is enlightening:

Q. Well, you've never had a discussion with her at all on any of these accounts about being the co-owner or beneficiary, did you?

A. Not that I can recall.

Q. It was never her intent to make you the co-owner or sole beneficiary on her Enrichment accounts, was it?

A. It was not my intent to be the sole beneficiary of the estate.

Q. That's not my question. My question is, it was never your mother's intent that you be the co-owner and sole beneficiary of the Enrichment accounts?

A. She never said not to do that.

Q. Did she ever tell you to do it?

A. She never told me to do that.

Q. Did she ever tell you that it was her intent that you be the owner and sole beneficiary of the Voya account?

A. No.

Q. Did she ever tell you that you were the sole beneficiary or co-owner of the Prudential life insurance policy?

A. No.

Q. Did she ever tell you that she wanted you to be the co-owner or sole beneficiary of her Charles Schwab account?

A. No.

Q. Did she ever tell you that she wanted you to be the owner and sole owner of her house on 115 Cascade Lane?

A. She never did.

Plaintiff seems to have interpreted his 2017 appointment as executor of his mother's estate broadly. When asked whether he added himself as beneficiary to his father's "Voya" retirement account, he explained: "Because I was the executor, I needed to designate myself as the beneficiary." He did not add his brother and only sibling, Defendant, as a beneficiary.

Because Ms. Walsh put her confidence in Plaintiff, after having relied on her husband for many years to handle the finances, and Plaintiff exerted dominance over her finances by going beyond her instructions, we conclude that the Trial Court did not err by finding a confidential relationship between Ms. Walsh and Plaintiff, thereby satisfying the first step of the analysis for undue influence.

However, a confidential relationship alone does not establish undue influence. As this Court has previously explained:

> Without direct evidence of undue influence, a contestant must establish the existence of more than one suspicious circumstance to make out a prima facie case of undue influence. Proof of a confidential relationship alone will not support a finding of undue influence. However, if a contestant has proved the existence of a confidential relationship, together with a transaction that benefits the dominant party to the relationship or another suspicious circumstance, a presumption of undue influence arises that may be rebutted only by clear and convincing evidence.

- 15 -

*Kelley*, 96 S.W.3d at 196 (internal citations omitted).

We next consider Plaintiff's argument that the Trial Court erred by finding suspicious circumstances surrounding the 2017 Codicil and 2018 Deed. The Trial Court considered the following as suspicious circumstances: (1) the confidential relationship between Ms. Walsh and Plaintiff; (2) Ms. Walsh's age of 82 and numerous health issues, including but not limited to mobility issues, severe urinary tract infections, and 2022 dementia diagnosis; (3) the fact that the transactions, account ownership changes, and quitclaim deed were executed without Defendant's knowledge; (4) the unjust nature of the transactions by nature of disinheriting Defendant from the estate; (5) the fact that Ms. Walsh had just lost her lifelong spouse and would have been emotionally distraught; (6) the incongruity between the transactions at issue and her intentions reflected in the 1991 Will, which would have left her estate equally to both of her children.

We agree with Plaintiff that the evidence does not support the Trial Court's consideration of Ms. Walsh's dementia that was diagnosed years after the transactions at issue or its presumption that Ms. Walsh was emotionally distraught. Nevertheless, the evidence supports the Trial Court's finding of the other listed suspicious circumstances.

First, Plaintiff admitted that he did not inform Defendant of the 2017 Codicil or that his name was added to Ms. Walsh's accounts and that he was listed as the sole beneficiary on many of these accounts. Defendant testified that he did not know about the 2018 Deed until 2022 when he went to the courthouse after being unable to find the deed to his mother's house.

Plaintiff argues that Defendant had constructive notice of the 2018 Deed because it was filed in the Register's Office for Anderson County. Whatever constructive notice Defendant may have had is beside the point. The testimony demonstrated that Plaintiff intentionally kept Defendant in the dark about the 2017 Codicil and his co-ownership of and beneficiary designations on several of Ms. Walsh's accounts. The same can be construed for the 2018 Deed given the Trial Court's credibility determinations. Therefore, the Trial Court did not err by finding this as a suspicious circumstance.

Additionally, we affirm the Trial Court's finding that Plaintiff's transactions were unjust in that they effectively disinherited Defendant. Plaintiff designated himself the beneficiary on at least two accounts, the Charles Schwab account and the Voya account, and at the very least had unrestrained access to the Enrichment account. Through the 2018 Deed, Plaintiff gained full ownership and control of Ms. Walsh's home upon her death and expiration of her life estate. Through his actions, Plaintiff would have taken the lion's share of his mother's estate.

Lastly, the 1991 Will provided that the estate would be divided equally between Plaintiff and Defendant. The 2018 Deed, as well as the beneficiary designations, are at odds with this stated intent. Plaintiff argues that Ms. Walsh did not own the house in question until 2010, and therefore, her 1991 Will is irrelevant. The fact that her home was acquired after the 1991 Will was executed matters not. *See In re Estate of Cone*, 652 S.W.3d 822, 826 (Tenn. Ct. App. 2022) ("[A] will speaks and takes effect as if it had been executed immediately before the death of the testator unless a contrary intent is expressed in the will. Absent a contrary intent, we will construe a will as including all property owned by the testator at the time of death.") (internal citations omitted).

Moreover, evidence of multiple transactions that benefited Plaintiff was presented to the Trial Court, including the checks written out to Plaintiff, the 2018 Deed, and co-ownership of and beneficiary designations on at least three of Ms. Walsh's accounts.

Having concluded that Defendant successfully raised the presumption of undue influence, we proceed to consider Plaintiff's argument that he rebutted that presumption by clear and convincing evidence. Plaintiff argues he rebutted the presumption by demonstrating that Ms. Walsh received independent advice from Mr. Knolton.

Our Supreme Court has explained:

Once a confidential relationship has been shown and a presumption of undue influence arises, the burden shifts to the dominant party to rebut the presumption by proving the fairness of the transaction by clear and convincing evidence. To prove the fairness of the transaction, the dominant party may show that the weaker party received independent advice before engaging in the transaction that benefitted the dominant party.

*Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002) (internal citations omitted).

Although Ms. Walsh met with Mr. Knolton to execute the 2017 Codicil and the 2018 Deed, there is no indication from the testimony that Mr. Knolton offered her any advice. Mr. Knolton testified that he did what Ms. Walsh wanted and that he could not recall if she explained why she was making these decisions. Mr. Knolton's drafting of documents for Ms. Walsh falls short of the independent advice required to rebut the presumption of undue influence.

The parties both cite to *Richmond v. Christian*, 555 S.W.2d 105 (Tenn. 1977) in support of their positions. In that case, our Supreme Court held that the donor did not receive independent advice for multiple reasons, including the fact that the conversation between the donor and the attorney was not private and included the donee; the donee hired the attorney; the donor "apparently did not seek and, certainly, did not receive advice from an independent source concerning the advisability of the transfer to her son"; and the

attorney's "discussion of the transaction with [the donor] was cursory at best." *Id.* at 109. The Supreme Court reasoned:

> [The attorney] merely determined that she knew that the deed transferred the entire tract to her son and that such a transfer was what she intended. This falls short of the requirement of the rule stated in Turner v. Leathers, [232 S.W.2d 269 (Tenn. 1950)], supra, that the independent advice be complete as well as private. In that case, the donor met with an alleged independent advisor and told him that he knew what he was doing and intended to do it; but, the court observed:
>
> > "It is not a question of whether he knew what he intended to do, but how this intention was produced, whether it was by abuse of a confidential and fiduciary relation."

*Id.* (quoting *Turner v. Leathers*, 232 S.W.2d 269, 271 (Tenn. 1950)). Mr. Knolton testified that he merely did what Ms. Walsh asked him to do, but he notably did not testify that he gave her any advice. We therefore conclude that Plaintiff failed to rebut the presumption of undue influence by demonstrating that Ms. Walsh received independent advice.

The last designated issue is whether the Trial Court erred by crediting the $49,000 in rental income received by Plaintiff from his share of Ms. Walsh's estate. Because Plaintiff obtained the deed to Ms. Walsh's house through undue influence, the house should have passed to Ms. Walsh's estate rather than Plaintiff. The rental proceeds therefore belong to Ms. Walsh's estate rather than Plaintiff. Given that we have affirmed the Trial Court's determination that the 2018 Deed was obtained through undue influence, we affirm the Trial Court's decision in this respect as well.

## CONCLUSION

For the foregoing reasons, we affirm the Trial Court's judgment. We remand for collection of costs below. Costs on appeal are assessed against the appellant, Anthony D. Walsh, and his surety, if any.

_____
D. KELLY THOMAS, SPECIAL JUDGE